IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WEK INDUSTRIES, INC., | ) | CASE NO. 1:05 CV 2844 |
| | ) | |
| Plaintiff, | ) | JUDGE LESLEY WELLS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| BISHOP TOOL & DESIGN, INC., | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## Introduction

District Judge Lesley Wells has referred this case to the Magistrate Judge for report and recommendation[1] after a hearing on the motion for default judgment[2] of the plaintiff, WEK Industries, Inc.

WEK seeks a default judgment from defendant Bishop Tool & Design, Inc. for damages caused by Bishop's breach of a contract to manufacture and deliver two screws, two barrels, two feed throats, and a gear box for use by WEK in its business.

For the reasons discussed below, the Magistrate Judge recommends a judgment in favor of plaintiff WEK against defendant Bishop for the total amount of $200,000.

---

[1] ECF # 17.

[2] ECF # 16.

**Procedural History**

WEK filed a complaint against Bishop based on diversity jurisdiction.[3]  Service of process upon Bishop by certified mail returned unexecuted.[4]  Upon request, the Clerk issued an alias summons, which WEK attempted to serve by certified mail, return receipt requested.[5] This service also returned unexecuted.[6]

WEK again requested and received an alias summons, which the Clerk sent to Bishop by regular mail.[7]  A deputy clerk filed the return of service by ordinary mail dated May 23, 2006.[8]

Bishop filed an answer on August 3, 2006.[9]  The answer bore the date June 13, 2006, and was signed by Charles Como, President of Bishop.[10]

WEK filed a motion for default judgment, arguing that Bishop had untimely filed its answer and that the answer had been improperly signed by Bishop's corporate president rather than a licensed attorney.[11]  In response, the Court issued an order holding the entry of

---

[3] ECF # 1.

[4] ECF # 3.

[5] ECF # 5.

[6] ECF # 6.

[7] ECF # 7.

[8] ECF # 8.

[9] ECF # 10.

[10] *Id.*

[11] ECF # 11.

default in abeyance until November 17, 2006 to permit Bishop to file an answer through an attorney authorized to practice before the Court.[12]

Bishop did not file its answer, and WEK renewed its application for entry of default.[13] Thereafter, the Clerk entered default against Bishop.[14]

WEK renewed its motion for default judgment.[15] District Judge Wells referred the case to the Magistrate Judge for a hearing on that motion in accordance with Federal Rule of Civil Procedure 55(b)(2).[16]

The Magistrate Judge held a hearing on the motion on May 15, 2007.

## Recommended Findings of Fact

1. WEK is a Delaware corporation with its principal place of business in Ohio. WEK has a plant located in Jefferson, Ohio, which produces, among other things, plastic parts utilized in the automotive industry.

2. Bishop is a New Jersey Corporation with its principal place of business in New Jersey. Bishop manufactures components for plastic extrusion machinery.

3. Most of WEK's production is purchased by Honda.

---

[12] ECF # 13.

[13] ECF # 14.

[14] ECF # 15.

[15] ECF # 16.

[16] ECF # 17.

4. In 2005, WEK decided to replace and upgrade components of two of its extrusion presses, in particular a Sterling dual 10-pound machine and a Sterling dual 15-pound machine.

5. The upgrade was prompted by a necessity to enable WEK to satisfy Honda's production demands for the parts manufactured by those two presses. The parts are used in the air conditioning ducts of Honda Civics. WEK is the only United States supplier of those parts for Honda Civics.

6. In 2005, Chris Wilms, Facilities Manager of WEK, had conversations with Charles Como of Bishop. During those conversations, Mr. Wilms explained the work that had to be done and the need to have the parts delivered to WEK in Jefferson, Ohio, no later than July 3, 2005. Mr. Wilms also explained the consequences to WEK of late delivery. To WEK, it was more important to obtain the July 3 delivery date than to obtain the lowest price for the parts being manufactured.

7. The week of July 4, 2005, was the only feasible week to install the replaced and upgraded parts on the extrusion press. It is the week that all Honda plants and Honda suppliers in the United States would be shut down. It was expected that on or about July 11, the upgraded extrusion presses involved in this litigation would be up and running.

8. WEK solicited bids from other entities but other entities were unable to meet WEK's time constraint of delivery by July 3.

9. Bishop claimed experience with this type of work and repeatedly stated that it would meet the time deadline.

10.     Bishop sent a quotation to WEK on or about May 17, 2005.[17]  The quotation listed prices for a Sterling barrel, a Sterling re-grooved feed screw, a grooved feed throat and a gear box.  It also stated the terms of 35% down at the time of order, 30% at the time of shipment and the balance 30 days thereafter.  The following language appears on its quotation: "If plastic flows through it, Bishop can do it.…"

11.     On or about May 18, 2005, WEK submitted its purchase order to Bishop for an extruder gear box, grooved feed section, grooved feed screw and extruder barrel for the Sterling dual 10-pound machine and a grooved feed section, grooved feed screw and extruder barrel for the Sterling dual 15-pound machine.[18]

12.     WEK paid Bishop $48,650 at the time of the purchase order.

13.     On or about May 24, 2005, Bishop sent an invoice to WEK which acknowledged receipt of their $48,650 payment.[19]

14.     The final payment of $48,650 was not made due to Bishop's failure to perform.

15.     WEK disassembled the extrusion presses in anticipation of receiving the parts from Bishop on July 3, 2005.

16.     The parts did not arrive on July 3.  Mr. Como offered a number of excuses.  Mr. Como, on behalf of Bishop, then made repeated promises that all of the parts would be

---

[17] Default Judgment Hearing Exhibit 1.

[18] Default Judgment Hearing Exhibit 2.

[19] Default Judgment Hearing Exhibit 3.

-5-

there on July 11, July 18 and on subsequent other dates. Based upon those promises, WEK would make plans to install the equipment on those dates.

17. All of the parts did not arrive from Bishop until late August or early September 2005.

18. The extrusion presses, which were going to be using the Bishop-manufactured parts, were not usable until all of the parts arrived from Bishop. Furthermore, it takes a number of days to disassemble and then reassemble an extrusion press.

19. Late delivery caused a number of problems for WEK. It had two presses which were inoperable. While awaiting the repeatedly promised arrival of the Bishop parts, it had delivery responsibilities to Honda. Failure to perform its contracts with Honda would not only jeopardize future business from Honda but, if the Honda production line was shut down due to a lack of parts, Honda could seek to impose penalties of thousands of dollars per minute.

20. After the parts supplied by Bishop finally arrived, most of them proved to be defective and totally unusable until the defects were corrected.

21. The feed throats had the wrong mounting pattern, were of the wrong size, had grooves that were not concentric with the bore. They were unusable without correcting those problems. The problems were corrected by third-party contractors.

22. The extrusion screws were defective. Both were the wrong length which made them unusable until corrected. In addition, both were manufactured out of a soft material rather than the industry standard metal with a Rockwell hardness of 50 to 60. The length

problem was corrected by third-party contractors. The hardness problem meant that the screws would wear out much more quickly than ones with the proper hardness. They ultimately had to be replaced by WEK with screws of the appropriate hardness.

23. The gear box for the 10-pound machine was unusable. Although WEK had sent Bishop the serial number of the Sterling machine and, although Bishop had said it would obtain copies of the prints directly from Sterling, the gear box that arrived was the wrong size and could not be used without modifying it and the extrusion press itself. Repairs were made in-house by WEK employees.

24. The barrels were usable but, like all of the other parts, they arrived late, which caused problems for WEK.

25. To correct the defective workmanship in the feed throats and the feed screws, WEK hired third-party contractors. The amounts paid to correct the defective work and to ship the parts to and from those third-party contractors for repairs total $32,281.67.[20] If Bishop's workmanship had not been defective, those expenses would not have been incurred by WEK.

26. Because the extruder screws were made with improper and soft materials, they had to be replaced. The replacements were manufactured by General Plastex at a total cost of $14,900.[21] The extruder screws would not have had to be replaced if Bishop had used the hardened steel that is the standard in the industry.

---

[20] Default Judgment Hearing Exhibit 4, Section 1; Exhibits 5 and 5A.

[21] Default Judgment Hearing Exhibits 6, 6A, 6B and 6C.

27. Because the parts manufactured by Bishop were both delivered late and in a defective condition, WEK had to use a combination of overtime of its employees and outsourcing work in order to meet its commitments to Honda. Since the WEK plant was operating at a 100% capacity, to mitigate its damages and avoid default on the Honda contracts, it had to have its employees work weekends in order to attempt to meet production demands since two extrusion presses were inoperable. Production which could not be handled in-house with weekend overtime was outsourced to Allied Custom Plastics.

28. The overtime worked on the weekends totaled $172,026.19.[22] Overtime would not have been necessary if the parts supplied by Bishop had been delivered on time and in acceptable condition.

29. The Honda parts that could not be produced in-house through overtime were outsourced to Allied Custom Plastics. WEK paid Allied Custom Plastics a total of $185,804.54, the same amount as Honda paid WEK.[23] Whatever WEK charged Honda, it paid to Allied Custom Plastics. Thus, there was no profit earned by WEK on those transactions. WEK's bottom-line profit on those transactions, if produced in-house, would have been 26% of the $185,804.54. The remaining 74% of the price charged to Honda would have been WEK's cost of production. Those expenses were not incurred because the work was outsourced.

---

[22] Default Judgment Hearing Exhibits 8 and 8A.

[23] Default Judgment Hearing Exhibit 7.

30. Bishop knew almost immediately that there were problems with the timeliness of its performance. The complaint was filed on December 8, 2005 less than four months after final delivery of the parts. Thus, Bishop was notified and knew of problems with its performance within a reasonable time.

## Recommended Conclusions of Law

1. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because the suit is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims asserted occurred here.

3. "In order to prevail on a breach of contract claim in Ohio, a plaintiff must first establish (1) the existence of a valid contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff."[24] In this case, because of the entry of default, the only remaining issue is damages.

4. The feed throats, extrusion screws and gear box were defective, unfit for the ordinary purposes for which such goods are used and, therefore, not merchantable.[25]

---

[24] *Marathon Ashland Petroleum Co. v. Selker Bros., Inc.*, No. 3:04CV7638, 2007 WL 1169322, at *2 (N.D. Ohio Apr. 18, 2007).

[25] Ohio Rev. Code § 1302.27 and ECF # 1, Ex. 2 at 4, ¶ 11 (terms and conditions of WEK's purchase order).

5. Where, as here, there is a breach of contract, plaintiff is entitled to an award of damages that places it "in as good a position as it would have been in but for the defendant's breach."[26]

6. That same general principle applies to a breach of warranty. "The Court begins with the general position that the remedies provided under Chapter 1302 of the Ohio Revised Code are to be liberally administered for the purpose of putting a party aggrieved by a breach of contract or warranty in as good a position as if the other party had fully performed."[27]

7. Bishop had adequate notice within a reasonable time that there was a problem with its performance.[28]

8. The basic measure of damages for a breach of warranty is contained in Ohio Revised Code § 1302.88 as supplemented by consequential damages contained in Ohio Revised Code § 1302.89.[29]

9. A buyer's consequential damages frequently include profits lost as a result of the seller's breach.[30] Additional expenses incurred by the buyer resulting from the seller's

---

[26] *Marathon*, 2007 WL 1169322, at *2.

[27] *National Mulch & Seed v. Rexius Forest By-Products*, No. 2:02CV1288, 2007 WL 894833, at *27 (S.D. Ohio Mar. 22, 2007).

[28] *Chemtrol Adhesives v. American Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 54, 537 N.E.2d 624, 638 (1989).

[29] *National Mulch*, 2007 WL 894833, at **27-28.

[30] *E.g., Cyclops Corp. v. Home Ins. Co.*, 389 F. Supp. 476, 478-79 (W.D. Pa. 1975) (applying Ohio law); *Chemtrol*, 42 Ohio St. 3d at 44, 537 N.E.2d at 629.

breach, such as increased costs of repairs and labor, are also recoverable as consequential damages under § 1302.89.[31]

10. WEK acted reasonably in repairing the defective parts. The damages proximately caused by the delivery and subsequent repairs of the defective parts by third-party contractors is $32,281.67,[32] which Bishop is entitled to recover.

11. WEK acted reasonably in purchasing extrusion screws from General Plastics to replace the screws made by Bishop, which used improper material. The damage proximately caused by Bishop's breach relating to the screws is $14,900.[33] Bishop's recoverable damages include these damages of $14,900.

12. While the two extrusion presses were non-operational due to Bishop's breaches, WEK acted reasonably when it had its employees work weekend overtime on other presses to satisfy the production demands of Honda. It also acted reasonably in having its employees work overtime to repair the gear box for the 10-pound machine. The total cost to WEK of overtime worked due to Bishop's non-confirming performance between the weekend of July 16-17 and the weekend of October 8-9 was $172,026.19.[34] Bishop's recoverable damages include these damages of $172,026.19.

---

[31] *E.g.*, *World Metals v. AGA Gas*, 142 Ohio App. 3d 283, 289, 755 N.E.2d 434, 438 (2001); *National Mulch*, 2007 WL 894833, at *28.

[32] Default Judgment Hearing Exhibit 4, Section 1; Exhibits 5 and 5A.

[33] Default Judgment Hearing Exhibits 6, 6A, 6B and 6C.

[34] Default Judgment Hearing Exhibits 8 and 8A.

13. "A party may recover lost profits if (1) profits were within the contemplation of the parties at the time the contract was formed, (2) the loss of profits was a probable result of a breach of contract, and (3) the profits were not remote and speculative and may be demonstrated with reasonable certainty."[35] This does not require that a party actually be aware of the damages that will result so long as the damages were reasonably foreseeable as a probable result of a breach at the time of contracting.[36] The evidence of lost profits "need only be reasonable, not specific."[37]

14. WEK outsourced $185,804.54 in products for Honda to Allied Custom Plastics.[38] The testimony of Chris Wilms established that WEK reasonably expected to make 26% net profit on those orders. Its inability to produce those Honda parts denied WEK profit of 26% of $185,804.54 or $48,520. Accordingly, WEK's recoverable damages include these lost profit damages of $48,520.

15. Because of Bishop's performance problems, WEK did not make the third payment to Bishop of $48,650. Since that expense was avoided by Bishop's breach, Bishop is entitled to a credit of $48,650.

---

[35] *Marathon Ashland*, 2007 WL 1169322, at *2.

[36] *Environmental Network Corp. v. Goodman Weiss Miller, LLP*, No. 8772, 2007 WL 613989, at *6 (Cuyahoga Cty. App. Mar. 1, 2007).

[37] *Charles R. Combs Trucking, Inc. v. International Harvesters Co.*, 12 Ohio St. 3d 241, 244, 466 N.E.2d 883, 887 (1984).

[38] Default Judgment Hearing Exhibit 7.

16. WEK's recoverable damages total $267,779.86. After deducting the credit of $48,650, the net damages sustained to WEK are $219,129.86. However, since the prayer in the complaint was $200,000 a default judgment cannot exceed that amount.

## Summary of Recommendation

The Magistrate Judge recommends the adoption of the above proposed findings of fact and conclusions of law and the entry of judgment in favor of WEK in the amount of $200,000.

Dated:  June 15, 2007                                         s/ William H. Baughman, Jr.
                                                              United States Magistrate Judge

## Objections

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[39]

---

[39] *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).